UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| KIMBERLY M. SMITH, | CASE NO. 5:22-CV-01775-DAC |
| Plaintiff, | MAGISTRATE JUDGE DARRELL A. CLAY |
| vs. | **MEMORANDUM OPINION AND ORDER** |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

### INTRODUCTION

Plaintiff Kimberly Smith challenges the Commissioner of Social Security's decision denying supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On October 4, 2022, pursuant to Local Civil Rule 72.2, this matter was referred to me for preparation of a report and recommendation (non-document entry dated Oct. 4, 2022), and the parties subsequently consented to my jurisdiction pursuant to 28 U.S.C. § 636 (ECF #9). Following review, and for the reasons stated below, I **AFFIRM** the Commissioner's decision.

### PROCEDURAL BACKGROUND

Ms. Smith filed for SSI on August 28, 2020, alleging the onset of disability on August 1, 2020. (Tr. 191-96). The claim was denied initially and on reconsideration. (Tr. 92-97, 99-204). She then requested a hearing before an Administrative Law Judge. (Tr. 122-24). Ms. Smith (represented by counsel) and a vocational expert (VE) testified before the ALJ on July 20, 2021.

(Tr. 42-67). On August 23, 2021, the ALJ issued a written decision finding her not disabled. (Tr. 12-41). The Appeals Council denied Ms. Smith's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6; *see* 20 C.F.R. §§ 416.1455 and 416.1481).

## FACTUAL BACKGROUND

### I. PERSONAL AND VOCATIONAL EVIDENCE

Ms. Smith was 25 years old on her alleged onset date, and 26 years old at the time of the administrative hearing. (Tr. 92). She completed high school and had no past relevant work. (Tr. 35, 50).

### II. RELEVANT MEDICAL EVIDENCE

On August 1, 2019, Ms. Smith met with licensed professional clinical counselor Victoria Gutbrod of Emerge Ministries, Inc. for counseling. (Tr. 342-45). During the session, Ms. Smith discussed her younger brother's recent hospitalization for suicidal thoughts and her concern that her parents are not properly parenting her brother. (Tr. 344). Mental status examination revealed a depressed and irritated mood, angry and labile affect, appropriate grooming, distracted demeanor, poor judgment, fair concentration, and poor eye contact. (*Id.*).

On August 15, 2019, Ms. Smith met with Ms. Gutbrod for counseling. (Tr. 346-49). On mental status examination, Ms. Smith was anxious with an expansive affect, displayed poor hygiene, participated cooperatively during the session, maintained steady eye contact, and displayed fair judgment and good concentration. (Tr. 348). During the session, Ms. Gutbrod worked with Ms. Smith on building social skills and exploring social interactions and patterns. (*Id.*).

On August 27, 2019, Ms. Smith informed Ms. Gutbrod she would be meeting with someone from Medina County Board of Developmental Disabilities for a job assessment and placement. (Tr. 352). She reported feeling emotionally and mentally unwell. (*Id.*). Mental status examination revealed an anxious and depressed mood, apathetic and blunted affect, appropriate appearance, participatory cooperation, fair judgment, good concentration, and steady eye contact. (Tr. 352-53).

On September 9, 2019, Ms. Smith met with Ms. Gutbrod. (Tr. 355-57). She was anxious with an expansive and blunted affect. (Tr. 356). She was disheveled but participated cooperatively in the session and displayed fair insight, good concentration, and steady eye contact. (Tr. 356-57).

Ms. Smith returned to Ms. Gutbrod for counseling on October 24, 2019. (Tr. 358-61). During the session, Ms. Smith and Ms. Gutbrod discussed next steps to meeting Ms. Smith's desire to be independent, including getting her driver's license and a job with part-time hours. (Tr. 359). Mental status examination revealed a depressed, irritated, and anxious mood with an angry and expansive affect, poor/unwashed and disheveled appearance, impaired judgment, fair concentration, and steady eye contact. (Tr. 360). Ms. Gutbrod noted Ms. Smith was not cooperative during the session. (*Id.*).

On October 25, 2019, Ms. Smith attended a pharmacological management session with Rosemary McDonagh, RMHCNS, BC, at Cornerstone Psychological Services. (Tr. 285-86). Ms. Smith reported that Buspar helps with anxiety. (Tr. 285). Mental status examination revealed a well-groomed appearance, average eye contact and activity, clear speech that was coherent and goal-directed, normal thought content, no auditory or visual hallucinations, logical and organized thought process, full affect, cooperative behavior, and good insight and judgment. (Tr. 285-86).

Ms. Smith reported her mood was "better" and she was getting eight to nine hours of good quality sleep. (Tr. 286). Ms. Smith also reported "fine" appetite and concentration. (*Id.*). She described interpersonal relations as "better at work" with a new supervisor and related looking forward to her sister's Halloween party that evening. (*Id.*). She denied side effects of psychiatric medication and described feeling calmer and happier on her current medications (Prozac for depression and Buspar for anxiety). (*Id.*). Nurse McDonagh refilled Ms. Smith's medications and directed her to follow up in three to six months. (*Id.*).

On November 4, 2019, Ms. Smith attended a counseling session with Ms. Gutbrod. (Tr. 363-65). She reported navigating a lot of friendships and wanted to explore interpersonal skills to increase her social confidence. (Tr. 363). Mental status examination revealed an anxious and depressed mood, expansive affect, poor/unwashed and disheveled appearance, fair judgment and concentration, steady eye contact, and a participatory attitude. (Tr. 364).

On November 19, 2019, Ms. Smith informed Ms. Gutbrod she was experiencing higher levels of depression and obsessive thinking about being trapped or hopeless in her life circumstances. (Tr. 367). On mental status examination, Ms. Smith was depressed and anxious with a flat and expansive affect, was unwashed and disheveled, resistant to treatment, and displayed poor judgment, concentration, and eye contact. (Tr. 368). Ms. Gutbrod noted Ms. Smith was not oriented, commenting that Ms. Smith was "struggling with loss of future thinking, and detachment from sense of self." (*Id.*).

At a counseling session with Ms. Gutbrod on December 5, 2019, Ms. Smith presented as depressed and anxious with a sad and angry affect, had an unwashed and disheveled appearance, displayed fair concentration and judgment, maintained broken eye contact, and participated

cooperatively in the session. (Tr. 372). During the session, Ms. Gutbrod challenged Ms. Smith to "continue to take next steps in independence and gaining skills for adulthood." (*Id.*).

On December 19, 2019, Ms. Smith met with Ms. Gutbrod for counseling and expressed being angry with her family and feeling like a moody, angry teenager. (Tr. 375). Ms. Smith was depressed and anxious with an appropriate and angry affect, displayed appropriate grooming, showed good concentration and judgment, and participated cooperatively in the session. (Tr. 376).

On January 9, 2020, Ms. Smith reported to Ms. Gutbrod that she went on her first date and described feeling grief around the anniversary of her brother's death. (Tr. 379). Ms. Smith was anxious with a sad and expansive affect, was appropriately groomed, and displayed good judgment and concentration. (Tr. 380).

During a counseling session on January 21, 2020, Ms. Smith described and processed grief relative to family deaths and explored her new relationship. (Tr. 383). She presented as depressed and anxious with an appropriate affect, was appropriately groomed, displayed good judgment and concentration, and participated cooperatively during the session. (Tr. 384).

On February 24, 2020, Ms. Gutbrod noted Ms. Smith was anxious, angry, expansive, and apathetic with an unwashed appearance, displayed fair judgement and good concentration, and participated cooperatively during the session. (Tr. 388).

On March 10, 2020, Ms. Smith was depressed, irritated, and anxious with an appropriate affect. (Tr. 392). She was appropriately groomed and cooperative, displayed good judgment and concentration, maintained steady eye contact, and was cooperative. (Tr. 392-93).

On March 24, 2020, Ms. Smith reported struggling to manage her anxiety around COVID-19. (Tr. 395). During the session, Ms. Gutbrod noted Ms. Smith "was able to validate herself and

5

calm herself down with a more peaceful perspective." (Tr. 396). Ms. Smith presented as depressed and anxious, had an appropriate affect, was appropriately groomed, displayed good judgment and concentration, and was cooperative. (*Id.*).

On April 7, 2020, Ms. Smith met with Ms. Gutbrod via telehealth and reported experiencing increased alienation, depression, and social pressure since the pandemic began. (Tr. 400). Ms. Gutbrod described Ms. Smith as depressed, irritated, and anxious, with an angry affect and disheveled appearance. (*Id.*). Ms. Smith was distracted and displayed poor judgment, fair concentration, and broken eye contact. (Tr. 400-01).

Ms. Smith attended another telehealth counseling session with Ms. Gutbrod on April 21, 2020, where she reported poor self-care and hygiene for a week and a lack of internal motivation. (Tr. 404). Mental status examination revealed a depressed mood with an angry, apathetic, and blunted affect, poor hygiene and disheveled appearance, impaired judgment, fair concentration, and steady eye contact. (Tr. 404-05). Ms. Smith participated cooperatively during the session. (Tr. 405).

On April 24, 2020, Ms. Smith met with Nurse McDonagh in a telehealth session. (Tr. 287). Ms. Smith reported increased anxiety and depression two to three days a week due to the COVID-19 situation but described the symptoms as mild. (*Id.*). She denied medication side effects, described sleeping ten hours in duration, and reported normal appetite, variable energy, and fine concentration. (Tr. 288). She additionally described "okay" relationships with family but feelings of awkwardness around others. (*Id.*). Mental status examination revealed a mildly depressed and anxious mood, casually dressed appearance, cooperative attitude, normal eye contact with a calm, blunted expression, normal attention and concentration, clear speech that was coherent and goal-

directed, logical thought process, non-delusional thought content, and intact insight and judgment. (Tr. 288-89). Nurse McDonagh concluded: "[Patient] had been functioning well prior to COVID-19. Social isolation triggered mild anxiety and depressive symptoms lasting a few days a week. [Patient] does not wish to adjust medications at this time." (Tr. 289). The nurse instructed Ms. Smith to continue her medications as prescribed, continue with counseling, increase exercise, consume healthy food, and follow up in six months. (*Id.*).

On May 5, 2020, Ms. Smith attended a telehealth appointment with Ms. Gutbrod and presented as depressed and anxious with a sad and apathetic mood. (Tr. 408). She was disheveled, resistant to treatment, and displayed impaired judgment, fair concentration, and poor eye contact. (Tr. 408-09).

On May 21, 2020, during a telehealth counseling session, Ms. Smith reported struggling with family relationships. (Tr. 412). Mental status examination revealed a depressed and anxious mood, apathetic and blunted affect, appropriate appearance, impaired judgment, fair concentration, and steady eye contact. (Tr. 412-13). Ms. Gutbrod described Ms. Smith as participatory in the session. (Tr. 412).

On June 9, 2020, Ms. Smith attended a counseling session with Ms. Gutbrod at the Emerge Ministries, Inc. office. (Tr. 414). Mental status examination revealed a depressed and anxious mood, apathetic and expansive affect, an unwashed and disheveled appearance, impaired judgment, fair concentration, and poor eye contact. (Tr. 416-17). Ms. Smith was described as distracted and resistant. (Tr. 416).

On June 23, 2020, Ms. Gutbrod noted Ms. Smith was depressed, manic, and anxious with an expansive and intense affect. (Tr. 421). Ms. Smith was unwashed and disheveled, distracted, and displayed impaired judgment, fair concentration, and poor eye contact. (Tr. 421-22).

On July 7, 2020, Ms. Smith attended another in-office counseling session with Ms. Gutbrod. (Tr. 423). Mental status examination revealed a depressed and anxious mood with an apathetic affect, an unwashed and disheveled appearance, impaired judgment, fair concentration, steady eye contact, and participatory behavior. (Tr. 425-26).

On July 27, 2020, Ms. Smith presented as irritated and anxious with an angry, apathetic, and expansive affect. (Tr. 429). She was disheveled and unwashed, distracted, and displayed fair judgment and concentration. (Tr. 429-30).

On August 11, 2020, Ms. Smith described feeling overwhelmed and reported a fear of vulnerability. (Tr. 433). She presented much the same as at the prior counseling session on July 27, but was participatory rather than distracted and maintained steady eye contact. (Tr. 433-34). Ms. Gutbrod instructed Ms. Smith to practice social skills. (Tr. 433). On August 26, Ms. Gutbrod noted Ms. Smith was depressed, irritated, and anxious with an angry and frustrated affect. (Tr. 437). She was unwashed and disheveled, distracted, and displayed fair judgment and concentration. (Tr. 437-38).

On September 8, 2020, Ms. Smith reported to Ms. Gutbrod that she has taken steps to better manage her loneliness and social isolation by becoming more active in the streaming world and being a moderator for a site. (Tr. 440). Mental status examination revealed a depressed and anxious mood, appropriate affect and grooming, fair judgment, good concentration, steady eye

contact, and participatory cooperation. (Tr. 441). She presented as largely the same, albeit with a disheveled appearance, on September 22, 2020. (Tr. 445).

On October 5, 2020, Ms. Smith and Ms. Gutbrod discussed managing anxiety and distress. (Tr. 448). Mental status examination revealed a depressed, anxious, and irritated mood, angry and expansive affect, disheveled appearance, distraction, impaired judgment, fair concentration, and steady eye contact. (Tr. 449).

On October 19, 2020, Ms. Smith reported to Ms. Gutbrod that she becomes upset with change and needs to process and adjust to changes. (Tr. 453). Ms. Smith presented as depressed and anxious with an angry and apathetic affect and displayed appropriate grooming, good judgment, fair concentration, steady eye contact. (*Id.*).

On November 17, 2020, Ms. Smith and Ms. Gutbrod worked on social and emotional skills, self-awareness, and emotional regulation. (Tr. 456). Mental status examination revealed a depressed and anxious mood with a sad, tearful, and apathetic affect. (Tr. 457). Ms. Smith was disheveled and poorly groomed, displayed poor judgment and fair concentration, and maintained broken eye contact. (*Id.*).

On December 11, 2020, Ms. Smith had another telehealth appointment with Nurse McDonagh. (Tr. 291-94). She reported her depression and anxiety were under control and she was coping with the pandemic by making baby blankets, reading the Bible, completing daily tasks using a planner, talking with friends online, and seeing one friend in person on rare occasions. (Tr. 291). Ms. Smith denied medication side effects, described normal sleep habits, appetite, energy, and concentration, and described "fine" interpersonal relationships while working two days a week at a consignment shop. (Tr. 292). Ms. Smith reported an "ok" mood, and a mental status examination

otherwise revealed a consistent affect, casually dressed appearance, cooperative attitude, calm behavior with normal eye contact, normal attention and concentration, clear speech and talkative, logical and organized thought process, normal thought content, good insight and judgment, and intact problem-solving abilities. (Tr. 292). Nurse McDonagh instructed Ms. Smith to continue her medications and counseling, exercise, practice mindful eating, and follow up in three to six months. (Tr. 293).

On December 14, 2020, Ms. Smith met with Ms. Gutbrod and discussed self-care and her emotional connection with food. (Tr. 461). Ms. Smith presented as depressed with an angry and flat affect. (*Id*.). She was disheveled and poorly groomed, displayed fair concentration and impaired judgment, and maintained broken eye contact. (*Id*.). On December 28, 2020, Ms. Smith and Ms. Gutbrod discussed grief, social isolation, and Ms. Smith's lack of self-esteem and self-motivation. (Tr. 464). She presented similarly as at the previous counseling session. (Tr. 465).

On January 26, 2021, Ms. Smith and her parents attended a counseling session with Ms. Gutbrod and discussed Ms. Smith's desire to be more independent, challenged more, and recognized for the growth she has worked towards. (Tr. 468). Mental state examination revealed an anxious mood, appropriate affect, appropriate grooming, good judgment and concentration, steady eye contact, and participatory cooperation. (Tr. 469).

On February 9, 2021, Ms. Smith and Ms. Gutbrod worked on personal boundaries and explored Ms. Smith's current dating relationship. (Tr. 472). Ms. Smith presented as depressed and anxious with an apathetic and blunted affect, unwashed and disheveled, and with impaired judgment and fair concentration. (Tr. 473). On February 24, 2020, Ms. Smith was depressed and

10

anxious but with appropriate affect, appropriate grooming, and good concentration and judgment. (Tr. 477).

On March 10, 2021, Ms. Smith met with Ms. Gutbrod and reported feeling social and emotional anxiety in her new dating relationship. (Tr. 505). Mental status examination was normal except Ms. Smith was anxious. (Tr. 506). On March 25, 2021, Ms. Smith presented similarly and discussed her recent break-up with her boyfriend over divergent religious views. (Tr. 509).

On April 8, 2021, Ms. Smith reported to Ms. Gutbrod that she felt sad about her supervisor leaving for a new position and needed to adjust to the change in routine. (Tr. 513). Ms. Smith also discussed seeking a new job opportunity closer to home and with more hours. (*Id.*). Mental status examination was largely normal, except Ms. Smith displayed a depressed and anxious mood. (Tr. 514). On April 21, 2021, Ms. Smith and Ms. Gutbrod discussed increasing distress tolerance and healthy coping skills. (Tr. 517). Ms. Smith presented similarly to her last counseling session. (Tr. 518).

On May 6, 2021, Ms. Smith and Ms. Gutbrod discussed the distress Ms. Smith encounters living with her family and explored healthy communication skills. (Tr. 521). Mental state examination revealed a depressed and anxious mood, expansive affect, disheveled appearance, distraction, impaired judgment, and fair concentration. (Tr. 522).

On May 7, 2021, Ms. Smith attended a telehealth appointment with Nurse McDonagh and reported being "stable for the most part except for PMS" and described having PMS symptoms one to two days a month. (Tr. 490). She also reported becoming anxious staying at home and feeling better when she takes walks. (*Id.*). Ms. Smith denied medication side effects. (*Id.*). Nurse

McDonagh instructed Ms. Smith to continue her medications, incorporate sleep hygiene practices, and exercise. (Tr. 491).

On May 18, 2020, Ms. Smith reported high levels of stress after being placed on probation at work by her new supervisor. (Tr. 525). Mental status examination was largely normal except Ms. Smith displayed an anxious and depressed mood. (Tr. 526).

On June 3, 2021, Ms. Gutbrod noted Ms. Smith's hyperfocus on the situation at work with her supervisor. (Tr. 529). They discussed social skills and solution-focused thinking. (*Id.*). Ms. Smith presented as depressed and anxious with a sad, tearful, and angry affect. (Tr. 530). She was disheveled and displayed fair concentration and judgment but poor eye contact. (*Id.*).

On June 15, 2021, Ms. Smith and Ms. Gutbrod continued to discuss social and emotional distress and also talked about managing the work situation, giving her resignation, and taking next steps in seeking employment. (Tr. 533). Mental state examination revealed a depressed and anxious mood with a sad, apathetic, and blunted affect. (Tr. 534). Judgment and concentration were intact, and Ms. Smith maintained steady eye contact. (*Id.*).

On July 8, 2021, Ms. Smith and Ms. Gutbrod focused on managing her distress with seeking a new job and increasing skills for adjusting to change. (Tr. 537). Ms. Smith reported working with an agency to find a job placement and explored her fears associated with holding a job that overwhelms her. (*Id.*). Mental status examination was normal except Ms. Smith's mood was anxious and depressed. (Tr. 538).

## III.  MEDICAL OPINIONS

On January 20, 2021, State agency psychological consultant Jaime Lai, Psy.D., reviewed the residual functional capacity (RFC) established in 2018, Ms. Smith's Function Report, one

treatment note from Cornerstone dated December 11, 2020, the results of one psychological assessment conducted in February 2019, and one treatment note from her family physician. (Tr. 93-94). Based on the psychologist's review, Dr. Lai concluded Ms. Smith was moderately limited in her abilities to understand, remember, and apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage herself. (Tr. 94). Dr. Lai adopted the prior ALJ's RFC in the decision dated October 11, 2018. (Tr. 96).

On April 3, 2021, another state agency mental health consultant, Irma Johnston, Psy.D., reviewed Ms. Smith's claim on reconsideration and affirmed Dr. Lai's adoption of the 2018 RFC. (Tr. 100-04). I note here that Dr. Johnston's analysis of the evidence consisted of her review of three treatment notes from counseling sessions, all dated in 2019, and one treatment note from her family physician. (Tr. 100).

The ALJ evaluated these opinions and determined:

> The State agency [consultants'] findings are persuasive because they provided pointed reviews of the relevant medical evidence, including the normal clinical observations made by the claimant's psychiatrist at the December 2020 telemedicine visit (*e.g.*, intact ability to focus attention and concentrate) along with subjective reports of depression and anxiety being "under control" and even coping "fairly well"" with the Pandemic and keeping herself busy, the February 2019 psychological evaluation done by Dr. Miller, and several 2019 counseling notes from Emerge Ministries that[sic]. Complementing such supportability of their findings from the available medical evidence, the expanded record at the hearing level of this application bears out an overall consistency of their findings of no material change in the functionally limiting effects of the claimant's mental health impairments since the time of the prior ALJ decision. In example, the May 2021 (and only additional) psychiatric follow-up note still shows primarily stable depression and anxiety, coping with symptoms well when they occur, having no side effects of her two medications, seeing some friends occasionally, continuing to work two days per week, and at most endorsing difficulty wearing a facial mask due to feeling dizzy and fear of hyperventilating. The March 2021-July 2021 counseling notes from Emerge Ministries also show that the State agency [consultants'] findings remain consistent with the total medical record, as they predominantly show appropriate affect and appearance/grooming, participatory cooperation, good

13

judgment, good concentration, and steady eye contact; do discuss the events of the new supervisor leading to problems at her job, and ultimately deciding to resign, but also indicate that she has been looking for another job and obtained an interview with the help of the county agency; and generally show no significant decline in functioning over the current year. The overall persuasiveness of the State agency [consultants'] findings is bolstered by their ability to review the different medical sources' reports as a cohesive and longitudinal whole and by their familiarity and expertise with Social Security program regulations for evaluating medical evidence and other factors when arriving at a finding of a residual functional capacity, which in this case includes the specially applicable *Drummond* AR.

(Tr. 33).

On July 28, 2021, Ms. Gutbrod completed an RFC assessment, which was co-signed by David A. Lichi, Ph.D., and opined Ms. Smith can handle little change in the work environment and is limited to simple, routine, and repetitive tasks; low stress work; work that does not require strict production quotas; and can be responsible for the health, safety, and welfare of others. (Tr. 494). Ms. Gutbrod determined Ms. Smith could not engage in work involving confrontation, arbitration, or negotiation; strict time limits for completing tasks; the supervision of others; or travel for work. (*Id.*). She opined Ms. Smith could maintain superficial interaction with the public, occasional interaction with coworkers, and frequent interaction with supervisors. (*Id.*). She also felt Ms. Smith has issues with responding appropriately to regular work criticism and would require extra reminders or assistance on a weekly or daily basis to properly perform work tasks. (*Id.*). Ms. Gutbrod also stated "[Ms. Smith] presents with a low threshold for distress, change, public interaction or perceived pressure that is time limited. She will cry, hold [her] head, hit her head, flail, moan, or use other movements to soothe and regulate." (*Id.*). Otherwise, Ms. Gutbrod concluded Ms. Smith would be absent once a month on account of her impairments and noted "she is consistent if the task is manageable." (Tr. 498). Ms. Gutbrod also determined Ms. Smith

14

would be off-task 10-15% of the day. (*Id.*). Finally, in the four broad areas of mental functioning, Ms. Gutbrod opined Ms. Smith was markedly or extremely limited. (Tr. 495-97).

> The ALJ evaluated this opinion and determined:

> The July 2021 opinion from the claimant's longstanding counselor is not persuasive except as to the positive abilities to complete simple, routine, repetitive tasks with no strict production quotas or strict time limits, occasional ability to interact with coworkers, and reduced ability to handle stress and changes in a work setting. The ratings of marked to extreme limitations in the broad areas of mental functioning, expected time off task, and cited need for weekly to daily reminders or extra assistance in order to perform even simple, routine work tasks properly are poorly supported by her limited rationale that unduly and overly broadly sweeps over far too many less remarkable counseling notes that she has written over the past three years. That is, Ms. Gutbrod wrote that the claimant "presents with a low threshold for distress, changes, public interaction, or perceived pressure that is time limited...she will cry, hold [her] head, hit her head, flail, moan or use other movements to soothe & regulate." At no point over the last few years of counseling notes has Ms. Gutbrod documented observations of such behavior from the claimant, and none appear to report this as a frequently or otherwise regularly occurring issue of an inappropriate response to stress. Moreover, many of the 2021 counseling notes show improvement in clinical observations as to concentration, eye contact, appearance, affect, and behavior, which do not support the marked to extreme limitations and other aspects of her opinion. In addition to these significant shortcomings in supportability, the counselor's opinion is not consistent with the other medical evidence in the record, including especially the quite unremarkable psychiatric progress notes from Nurse McDonagh at Cornerstone that show at most mildly anxious and mildly depressed mood at the onset of the COVID-19 Pandemic, positive coping skills used to successfully respond to stressors relating to the Pandemic and beyond, intact ability to attend and concentrate, and stable and conservative medication regimen over the past three years (and longer) through Buspar and Prozac.

(Tr. 34).

## IV.     OTHER RELEVANT EVIDENCE

Ms. Smith completed a Function Report, dated December 28, 2020, detailing how her conditions limit her activities. (Tr. 233-240). She cited communication errors, poor stress management, and slower pace as reasons for her inability to work. (Tr. 233). On a typical day, Ms.

Smith wakes up, eats breakfast, does chores, plays video games, eats lunch and dinner, helps with cleanup after dinner, attends to more tasks in between meals, and talks with friends. (Tr. 234). Ms. Smith reported no problem caring for her personal hygiene but stated she needs written and verbal reminders for "some things." (Tr. 235). She is able to prepare her own food, clean, do laundry, wash dishes, sweep, mow, dust, rake, shovel snow, and pull weeds. (*Id.*). She endorsed "sometimes" needing questions answered. (*Id.*).

Ms. Smith can shop for herself, pay bills, count change, handle a savings account, and use a checkbook. (Tr. 236). Her hobbies include watching television, playing video games, art, and spending time with friends. (Tr. 237). She spends time with others, both online and in-person, and regularly goes to church, the workplace, grocery store, counseling office, and friends' houses. (*Id.*). She reported "sometimes" being worried about doing certain things alone and needs someone to accompany her. (*Id.*). She endorsed having problems getting along with others because she "seem[s] to make people upset without realizing [it]." Otherwise, Ms. Smith claimed difficulty with paying attention to verbal instructions, becoming distracted easily, misunderstanding what other people are trying to communicate, and forgetting what she has been told such that she needs to write it down. (Tr. 238). She sometimes cannot pay attention for too long because she "zone[s] out a lot." (*Id.*). Ms. Smith can follow written instructions well, though she sometimes needs to ask questions, but does not follow verbal instructions well. (*Id.*). She also endorsed feeling easily overwhelmed, getting upset with changes in routine, and feeling as though people are staring at her. (Tr. 239).

## V.  ADMINISTRATIVE HEARING

On July 20, 2021, Ms. Smith and VE Brett Salkin testified before the ALJ. (Tr. 44-67).

Ms. Smith, born in 1994, lives with her parents and fifteen-year-old brother. (Tr. 50). She has Asperger's (autism spectrum disorder), anxiety, and depression. (Tr. 47-48). She takes medication for anxiety and depression, which she described as making a "marked difference" for the better. (Tr. 60) ("I don't feel anxious like as often. It is kind of like it is still there but it more calms down."). Ms. Smith spends several hours a day on social media talking to people and playing games online. (Tr. 54-55). She described becoming confused sometimes when playing online games that require teamwork and needing to ask questions of her teammates. (Tr. 61). When visiting with friends in person, they watch movies, play games, talk, share a meal, or occasionally go for a hike. (Tr. 56). Other hobbies include drawing, painting, working on craft projects, making baby blankets, playing games with family and friends, and singing. (*Id.*). Ms. Smith sang in the church choir until the pandemic began. (Tr. 57).

Ms. Smith does not have her driver's license and relies on family and friends for rides. (Tr. 55). She has her temporary license and has slowly become more comfortable with driving. (Tr. 57). At the hearing, she expressed feeling confident enough try to driver's test soon. (Tr. 57-58).

Ms. Smith explained she is unable to work a full-time job because she struggles with staying on task, maintaining a fast enough pace, and communicating effectively with coworkers. (Tr. 52). She described becoming easily confused with instruction. (*Id.*). She used to work at a second-hand boutique as a store clerk under the supervision of Medina Creative Accessibility, which offers supported work environments for individuals with disabilities. (Tr. 51). She quit the position because she "had some issues with some of the people at work." (Tr. 51-52). Ms. Smith explained that her new supervisor confronted her about not doing certain tasks properly and forgetting things all the time. (Tr. 58). The confrontation "went south" when Ms. Smith expressed feeling

17

overwhelmed, which caused her supervisor to get upset with her. (*Id.*). She explained to the ALJ that she can avoid making mistakes at work if the tasks are routine, straight forward, and she can ask questions of her supervisor. (Tr. 60).

The ALJ asked VE Salkin if a hypothetical individual of Ms. Smith's age, education, and experience could perform work at any exertional level if limited to performing simple and routine tasks in a setting free of fast-paced production requirements or strict production quotes, in a routine environment with few changes in workplace tasks and duties; occasional interaction with coworkers and supervisors; and no interaction with the general public. (Tr. 63). The VE identified three medium exertion, unskilled SVP 2 positions such an individual could perform:

- Groundskeeper (DOT 406.687-010; 180,000 jobs nationally);

- Cleaner (DOT 323.687-010; 306,000 jobs nationally); and

- Laundry worker (DOT 361.684-014; 65,000 jobs nationally).

(Tr. 64).

Counsel for Ms. Smith asked the VE if an employee could maintain competitive employment if she required additional weekly reminders about her duties. (Tr. 65). VE Salkin stated that weekly reminders are not unusual, especially for unskilled work; however, it would be considered supportive employment or an accommodation if she needed more reminders than other people customarily require. (*Id.*).

Otherwise, the VE testified an employer tolerates an employee being off task no more than 10% of the workday and absent, including late arrivals to and early departures from work, no more than once per month. (Tr. 65).

18

## The ALJ's Decision

The ALJ's decision included the following findings of fact and conclusions of law:

1.   The claimant has not engaged in substantial gainful activity since June 20, 2020, the date on which the application was filed (20 CFR 416.971 *et seq.*).

2.   The claimant has the following severe impairment: autism spectrum disorder, major depressive disorder with anxious distress, and generalized and social anxiety disorders (20 CFR 416.920(c)).

3.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926).

4.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: She can perform simple, routine tasks in a setting free of fast-paced production requirements and strict production quotas, and which is routine in that it contemplates few changes in workplace tasks or duties; and she can have occasional interaction with coworkers and supervisors, but no interaction with the general public.

5.   The claimant has no past relevant work (20 CFR 416.965).

6.   The claimant was born on September 18, 1994, and was 25 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR and 416.963).

7.   The claimant has at least a high school education (20 CFR 416.964).

8.   Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968)

9.   Considering the claimant's age, education, no work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969, and 416.969a).

11.   The claimant has not been under a disability, as defined in the Social Security Act, since June 20, 2020, the date on which the application was filed (20 CFR 416.920(g)).

19

(Tr. 18-36).

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial

evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security,* 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Ms. Smith claims the unfavorable decision is not supported by substantial evidence because the ALJ's findings related to the persuasiveness of the medical opinions are flawed. (Pl.'s Br., ECF #10, PageID 578). For the reasons that follow, I reject this argument and thus AFFIRM the ALJ's decision.

A claimant's RFC is an administrative assessment of the extent to which the claimant's impairments and related symptoms may cause physical or mental limitations or restrictions that may affect his capacity to do work-related activities. SSR 96-8p, 1996 WL 374184, at *2. The RFC must be based on all relevant evidence in the case record, including but not limited to medical history, medical signs and laboratory findings, the effects of treatment, reports of daily activities, recorded observations, medical source statements, and the effects of symptoms. *Id.* at *5.

22

Because Ms. Smith filed her applications after March 27, 2017, the medical opinions are evaluated under the regulations found in 20 C.F.R. § 416.920c. Under these revised regulations, the ALJ is to articulate "how persuasive [she] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record." *Id.* at § 416.920c(b).

The ALJ is not required to defer to or give any specific evidentiary weight to a medical opinion, is not bound by the "treating physician rule," and is not required to give a treating source controlling weight. *See Jones v. Comm'r of Soc. Sec.*, No. 19-1102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). In determining the persuasiveness of a medical opinion, the ALJ considers five factors: (1) supportability; (2) consistency; (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors that tend to support or contradict a medical opinion. 20 C.F.R. §§ 416.920c(c)(1)-(5). The ALJ must articulate the consideration given to the medical opinions in the record, grounded in the two "most important factors" of supportability[1] and consistency.[2] 20 C.F.R. § 416.920c(a). An ALJ must explain how she considered the factors of supportability and consistency, and "may, but [is] not required to" explain the remaining factors of relationship with the claimant, specialization, or other factors, absent the ALJ's finding that two opinions are "equally" persuasive. *See* 20 C.F.R. §§ 416.920c(b)(2)-(3).

_____

[1]  "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his medical opinion(s) or prior administrative medical finding(s), the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).

[2]  "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

Agency regulations no longer require deference to a treating physician's opinion, but the reason-giving requirement still exists so claimants (and reviewing courts) may understand the disposition of their claims. *See Hardy v. Comm'r of Soc. Sec.*, 554 F. Supp. 3d 900, 908 (E.D. Mich. 2021) (applying the reason-giving requirement "with equal force to the new regulations, which require explanations for determinations that a medical opinion is unpersuasive"). Agency regulations "set forth a 'minimum level of articulation' to be provided in determinations and decisions, in order to 'provide sufficient rationale for a reviewing adjudicator or court.'" *Warren I. v. Comm'r of Soc. Sec.*, No. 20-495, 2021 WL 860506, at *8 (N.D.N.Y. Mar. 8, 2021) (quoting 82 Fed. Reg. 5844-01 (2017)). An "ALJ's failure . . . to meet these minimum levels of articulation frustrates [the] court's ability to determine whether [the claimant's] disability determination was supported by substantial evidence." *Vaughn v. Comm'r of Soc. Sec.*, No. 20-1119, 2021 WL 3056108, at *11 (W.D. Tenn. July 20, 2021).

### A.    Ms. Gutbrod's Opinion

#### 1.    Supportability

Ms. Smith first takes umbrage with the ALJ's supportability finding, noting "[t]he ALJ confusingly claimed that Ms. Gutbrod's own notes did not document observations of abnormal behavior, but then claimed, 'none appear to report this as a frequently or otherwise regularly occurring issue of an inappropriate response to stress.'" (*Id.* at PageID 578-79). Ms. Smith appears to misunderstand the focus of the ALJ's supportability analysis.

The ALJ found that Ms. Gutbrod's statement about Ms. Smith "holding her head, hitting [her] head, flailing, moaning, or using other movements to soothe and regulate" herself was not supported by Ms. Gutbrod's own counseling notes. (Tr. 34). Nowhere in the written decision does

the ALJ claim Ms. Gutbrod did not document abnormal findings, only that she did not document the specific soothing and regulating behaviors she cited to support her opinion. Substantial evidence supports the ALJ's logical conclusion here because not a single counseling note, or any other medical treatment note, references observations of such self-soothing, self-regulating behavior. Moreover, as the ALJ emphasized, the counseling and other treatment notes are devoid of any reference to Ms. Smith reporting such behavior to Ms. Gutbrod.

Ms. Smith also claims the ALJ did not provide specific references or citations to support her statement regarding "far less remarkable counseling notes." Not so. Reading the ALJ's decision as a whole and with common sense, there are specific references to treatment notes reflecting less remarkable clinical findings. As an example, the ALJ noted as follows:

> However, at least over half of the counseling sessions reflect less remarkable clinically observed problems in behavior (cooperative and "participatory"), judgment (fair to good), concentration (fair to good), eye contact (steady), affect (appropriate), and attention shown to personal grooming and appearance (appropriate).

(Tr. 29) (internal citations omitted); *see Pritt v. Comm'r of Soc. Sec.*, 1:21-cv-1728, 2022 WL 2135304, *13 (N.D. Ohio June 14, 2022); *see also Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014) (recognizing that the ALJ's analysis may be found throughout the decision).

Next, Ms. Smith takes issue with the ALJ's statement that many of the 2021 counseling notes showed improvement in clinical observations as to concentration, eye contact, appearance, affect, and behavior; Ms. Smith claims "not a single record shows improvement in her conditions or behavior." (ECF #10 at PageID 581).

The Sixth Circuit recognizes that "improvement" in the level of mental functioning is a relative concept and is dependent on the base level from which the improvement is measured:

> Even if [a doctor's] use of the word "better" referred to Plaintiff's mood, this word did not provide the ALJ with substantial evidence from which to find that Plaintiff's mental impairment had subsided. The ALJ made no inquiry into the degree of improvement, or from what baseline Plaintiff improved. Under the ALJ's logic, any improvement in one's mood, regardless of how small and from what level the individual improved, would defeat a claim of mental impairment. This cannot be so.

*Boulis-Gasche v. Comm'r of Soc. Sec.* 451 F. App'x 488, 494 (6th Cir. 2011). To the extent the ALJ relied on Ms. Smith's improvement to discount Ms. Gutbrod's opinion, the ALJ's reasoning is not supported by substantial evidence. As described above, the longitudinal record, considered chronologically, shows the clinical findings of mental status examinations varied considerably over time, and the ALJ did not cite findings or evidence to show the baseline from which Ms. Smith improved, or the degree of improvement. However, such error is harmless because the ALJ's decision was also based on the less remarkable clinical findings and the fact that Ms. Gutbrod's rationale regarding self-regulating, self-soothing behaviors is not supported by any observation or report in her counseling notes; as discussed above, both conclusions are supported by substantial evidence of record.

### 2. Consistency

As to the consistency factor, Ms. Smith does not claim the ALJ did not evaluate the consistency of Ms. Gutbrod's opinions with other evidence in the record. Plainly, the ALJ compared Ms. Gutbrod's opinions with the four altogether benign psychiatric progress notes from Nurse Donagh. (*See* Tr. 34). Instead, Ms. Smith claims "Ms.[*sic*] Donagh's notes are clearly inferior to Ms. Gutbrod's based upon length of treatment, time spent, and in the quality and detail of the notes taken. There is no real comparison to the consistency factor, as Ms. Gutbrod's examinations dominate the [the administrative transcript] with 81% of the medical records (177 of 217 pages)."

26

(ECF #10 at PageID 583). Ms. Smith's argument here is but a request to re-weigh the evidence in a manner consistent with her preferred outcome, something this Court cannot do. *See Brainard,* 889 F.2d at 681. Moreover, while frequency of treatment is a factor for the ALJ to consider when evaluating medical opinions, *see* 20 C.F.R. § 416.920c(c)(3), the ALJ is not required to articulate how she considered this factor unless she found the two opinions equally persuasive after evaluating them for consistency and supportability. *See* 20 C.F.R. §§ 416.920c(b)(2)-(3).

Moreover, the ALJ's consistency evaluation is not lacking the support of substantial evidence simply because of the disparity in the frequency of treatment between Ms. Gutbrod and Nurse Donagh. Even if, as Ms. Smith claims, substantial evidence supports a finding that Ms. Gutbrod's opinion is persuasive, I cannot overturn the ALJ's conclusion because substantial evidence, in the form of Nurse Donagh's benign clinical findings and conservative medication regimen, supports her finding that Ms. Gutbrod's opinion is inconsistent with other substantial evidence of record. *See Jones*, 336 F.3d at 477.

**B.    State Agency Consultants' Opinions**

According to Ms. Smith, "the ALJ's favorable finding on the factor of supportability is misplaced because the state agency physicians have no other records to compare for supportability," and the ALJ's entire reasoning "actually falls within the consistency factor." (ECF #10 at PageID 584). This argument is flawed; supportability, in the context of reviewing State agency opinions, looks to the basis of the State agency opinions. *See Mary W. v. Comm'r of Soc. Sec.,* No. 2:20-cv-5523, 2022 WL 202764, at *10 (S.D. Ohio Jan. 24, 2022), *report and recommendation adopted,* 2022 WL 394627 (S.D. Ohio Feb. 9, 2022).  Next, Ms. Smith claims the ALJ was "blatantly incorrect" in claiming that both State agency consultants reviewed "several 2019

27

counseling notes." (*Id.*). Contrary to her assertion, the ALJ did not claim both State agency consultants reviewed those records; rather, the ALJ analyzed their opinions together and provided a single list of the medical evidence upon which the State agency consultants based their opinions. (Tr. 33).

Ms. Smith next attacks the "quality" of Dr. Johnston's review, emphasizing the reviewing State agency psychologist only cited three of thirty-four counseling notes, and takes issue with the fact that Dr. Johnson's summary "barely discussed the abnormal objective findings contained in the record." (ECF #10 at PageID 584).

True, on reconsideration, Dr. Johnson did not provide a summary of the counseling notes post-dating December 19, 2019; however, the Sixth Circuit holds that an ALJ may rely on medical opinions from physicians who have not reviewed the entire record so long as the ALJ considers the post-dated evidence in formulating his opinion. *See, e.g., McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009) (indicating that an ALJ's reliance upon state agency reviewing physicians' opinions that were outdated was not error where the ALJ considered the evidence that was developed post-dating those opinions); *see also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 513 (6th Cir. 2013) ("Even if [a State agency physician's] RFC was completed without knowledge of these issues, however, the record reflects that the ALJ considered them."); *Patterson v. Comm'r of Soc. Sec.*, No. 1:16-cv-110, 2017 WL 914272, at *10 (N.D. Ohio Mar. 8, 2017) ("An ALJ may rely on a state agency reviewer who did not review the entire record, so long as the ALJ also considers the evidence post-dating the opinion."). Where a non-examining source does not review a complete case record, "we require some indication that the ALJ at least considered these facts

before giving greater weight to an opinion" from the non-reviewing source. *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009).

Here, the ALJ satisfied this requirement. Within the ALJ's evaluation of the State agency medical opinions, she acknowledged they did not review the full case record. (*See* Tr. 33). Though the State agency consultants did not review a complete case record, the ALJ's own analysis clearly spanned the entire record, including all the counseling notes. (*See* Tr. 28-30). In particular, the ALJ noted:

> Ultimately, the counseling notes in 2019-2021 from Emerge Industries do support at least stable and ongoing symptoms and limiting effects from Asperger's disorder, social anxiety disorder, and depressive disorder, with some instances suggesting improvement or at least less significant symptoms impacting daily activities, but fail to show any "material" worsening or more restrictive impact on the claimant's mental work-related abilities since the time of the October 2018 prior ALJ's decision.

(Tr. 29).

On this record, the ALJ's evaluation of the persuasiveness of the State agency consultants' opinions is supported by substantial evidence.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, I **AFFIRM** the Commissioner's decision denying supplemental security income.

Dated: September 7, 2023

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE